## In re CORNWALL PAPER MILLS COMPANY, Debtor.

**Bankruptcy No. 92–24791 (NLW).**

United States Bankruptcy Court, D. New Jersey.

July 13, 1994.

Lasser, Hochman, Marcus, Guryan and Kuskin by Richard L. Zucker, Roseland, NJ, for Paragon Enterprises.

Greenbaum, Rowe, Smith, Ravin & Davis by Nancy Isaacson, Woodbridge, NJ, for debtor Cornwall Paper Mills Co.

Pitney, Hardin, Kipp & Szuch by Jerrold I. Langer, Morristown, NJ, for Creditor's Committee.

NOVALYN L. WINFIELD, Bankruptcy Judge.

Before the Court is the motion of Paragon Enterprises ("Paragon"), to require Cornwall Paper Mills Company (the "Debtor" or "Cornwall") to pay administrative rents, pursuant to Bankruptcy Code ("the Code") section 503(b), for the use and occupancy of premises located at 300 Executive Drive, West Orange, New Jersey. 11 U.S.C. § 503(b). In support of this motion, Paragon has submitted the following documents for the Court's consideration: Memorandum in Support of the Motion ("Paragon Memo.") and the attached Certification of Mark Schaevitz filed March 11, 1994, ("Schaevitz Cert."); Supplemental Certification of Mark Schaevitz filed April 7, 1994, ("Schaevitz Supp. Cert."); Certification of Richard L. Zucker filed April 11, 1994, ("Zucker Cert."); and a letter Memorandum in Reply to the objections and memorandum of the Debtor filed on April 11, 1994. In turn, the Debtor submitted an objection and a Memorandum of law. ("Debtor's Memo."). The Debtor, however, failed to submit any supporting certifications. The Court also received a letter, filed March 30, 1994, on behalf of the Creditor's Committee indicating that it supports the Debtor's objection to the allowance of administrative rents. A hearing on this matter was held on April 11, 1994, at which time the Court considered the arguments of counsel.

The following constitutes this Court's findings of Fact and Conclusions of law made in accordance with Bankruptcy Rule 7052.

## FACTS

On September 26, 1985, Cornwall Paper Mills Co. entered into an Agreement to lease from Paragon 1,801 square feet of office space located at 300 Executive Drive, West Orange, NJ (the "Premises"). *See* Schaevitz Cert. at ¶ 3. The agreement provided for a five year lease from November 1, 1985 through October 31, 1990. A Lease Extension Agreement extended the lease another five years, to January 31, 1995. *Id.* at ¶ 4.

Prior to the expiration of the lease, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on June 15, 1992. *Id.* at ¶ 6. Since filing for bankruptcy, the Debtor has not paid Paragon any rents. *Id.* at ¶ 8. Nor does it appear that prepetition rents were paid to Paragon from July 1, 1991 to the commencement of the Chapter 11 case. *See* Zucker Cert., Exh. A.

On July 22, 1991, Cornwall ceased operating its paper manufacturing business. *See* Debtor's Memo. at ¶ 2–3. A fiscal agent, Myron Lehman ("Lehman"), was appointed for Cornwall on October 25, 1991. Approxi-

mately one month later, Cornwall consented to Lehman's appointment as a statutory receiver. *Id.* at ¶ 4–5. Lehman forwarded notice of his appointment as a receiver to Cornwall's creditors. ¶ 6. Cornwall asserts that as a result of this letter, "Paragon knew that Cornwall had ceased operating and [was] no longer present in the space." ¶ 6. The Court is not privy to the content of this letter, as the Debtor did not submit it as an exhibit.

Cornwall maintains that in October of 1991, when Lehman was appointed as the fiscal agent, Cornwall vacated and surrendered the premises although Cornwall admits that "some filing cabinets, office equipment and personal effects" were left behind. *Id.* at ¶ 11–13.

On February 2, 1992, Paragon changed the locks on the Premises without notifying or providing keys to Cornwall or its attorneys. *Id.* at ¶ 16. Cornwall has no knowledge of whether the receiver was given notice or new keys. *Id.* Cornwall first discovered the locks had been changed when it visited the premises in September of 1992. *Id.* at ¶ 17. At that time, Valerie San Giacomo, a representative of Cornwall, was given the new keys. In September of 1992, Cornwall entered the Premises and removed "the few filing cabinets and office equipment that had been left behind." *Id.* at ¶ 19.

It appears that the Debtor did not complete its removal of office furnishings from the Premises until November 1993. On October 27, 1993 and on November 1, 1993, the Debtor caused two Notices of a Proposed Private Sale ("Notices of Sale") of Cornwall's assets to be sent to its creditors including Paragon Enterprises. The sale of various items of Cornwall's personalty which remained on the Premises was consummated on November 21st and November 26th of 1993. *Id.* at ¶ 21–22. As described by the Debtor in the Notice of Sale, the items sold to the first purchaser, Robert Boyle, for $800.00 included:

ASH STAND, 12 SEAR RECEPTION [SIC] SEATING UNITED 4 METAL UPHOLSTERED SWIEL [SIC] CHAIRS, 15 DRAWER METAL LATERAL FILE CABINET 30' WIDE, ASSORTED DOUBLE PEDESTAL FORMICA TOP METAL DESKS, 2 SINGLE PEDESTAL FORMICA TOP METAL DESKS, WITH SIDE RETURNS, 1 ADLER ELECTRIC TYPEWRITER, 23 DRAWER METAL FILE CABINTS [SIC], LETTER SIZEW [SIC], 1 FORMICA TOP METAL CREDENZA 1 PAYMASTER CHECK PROTECTOR, 1 WOOD CREDENZA, 1 ADMIRAL COLOR TELEVISION[,] 1 TABLE LAMP[,] 34 DRAWER METAL FILE CABINETS, LETTER SIZE, 1 FORMICA TOP WOOD[,] 2 DOOR CABINETS, 1 SMALL WOOD TABLE, 1 LOT OF ASSORTED BOOKS, PAPER AND ETC[.][,] 1 1987 MERCURY TOPAZ 4 DOOR SEDAN.

*Id.* Exh. A. The Notice of Sale to the second purchaser, Mildred Gimson, for $500.00 included the following items:

2 WOOD CHAIRS, 2 DESKS, 2 SMALL TYPING CHAIRS, 1 FILING CABINET, 1 COAT RACK, 1 ELECTRIC TYPEWRITER.

*Id.* Exh. B.

Paragon maintains that it is entitled to administrative rents accrued from June 15, 1992, the date of the filing of the bankruptcy petition, to August 15, 1992, the expiration of the 60 day deadline provided for in Code section 365, at a rate of $3,060.24 per month, or $6,120.48, in accordance with the Agreement of Lease, plus 2% as provided in paragraph 52(d) of the Lease. *See* Schaevitz Cert. at ¶ 10. Additionally, Paragon asserts that it is entitled to administrative rents for the reasonable value of the Debtor's use and occupancy of the premises at a rate of $3,060.24 for the period of August 15, 1992 through March 15, 1994 for a total of $58,-144.56.[1] *Id.* Finally, Paragon claims that it is entitled to $3,060.24 per month, or $100.61 per diem, for any use or occupancy beyond March 15, 1994. It is no longer clear that this final claim is at issue as a result of the

---

1. The relevance of March 15, 1994 is unknown to the Court. It may be that Paragon selected this date arbitrarily in order to calculate the rent it assumed would be due when it filed its certification on March 11, 1994.

Supplemental Certification filed by Paragon which indicates that as of March 11, 1994, Cornwall "caused all of the equipment and fixtures located at the premises ... to be removed." *See* Schaevitz Supp. Cert. at ¶ 2.

Cornwall objects to Paragon's claim for administrative rents on the basis that the lease terminated prior to its bankruptcy. It contends: 1) the lease provided for automatic termination upon insolvency; *See* Debtor's Memo. at ¶ 30; 2) title to all assets vested in the receiver by virtue of state law, and thus, the lease terminated; 3) the lease terminated when Cornwall vacated the property and Paragon accepted the surrender by changing the locks without notifying Cornwall or providing Cornwall the keys; *Id.* at ¶ 36; or 4) Paragon substantially interfered with Cornwall's use of the premises, and as a result, the Debtor was constructively evicted. *Id.* at ¶ 37.

■ Alternatively, Cornwall argues that if the Lease remained in effect at the commencement of its bankruptcy case, Paragon's administrative rent claim is limited to the sixty day time period prior to the automatic rejection of the lease by operation of Code section 365(d)(4).[2] Cornwall contends that only a few items of personalty remained on the Premises at the commencement of the case, and that the presence of those few items did not result in continued use and occupancy of the Premises. Accordingly, in Cornwall's view, Paragon's claim for administrative rent does not meet the criteria for allowance in Code section 503, that the claim be an "actual, necessary cost and expense of preserving the estate ..." 11 U.S.C. § 503(b)(1)(A).

## DISCUSSION

Paragon moves pursuant to Code section 503(b) for the allowance of rents owed on the Premises to be paid from the Debtor's estate as an administrative expense. Section 503(b) provides in pertinent part as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate ... rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A). The significance of declaring an expense to be an administrative expense is that administrative expenses are granted first priority pursuant to section 507. 11 U.S.C. § 507.

Cornwall first argues that the accrued rent cannot be an administrative rent because the lease expired prior to the bankruptcy. Alternatively, it suggests that if the lease did not terminate prior to the bankruptcy, that it was not an "actual, necessary cost" of preserving the estate and thus is not entitled to be classified as an administrative priority.

■ The Court rejects Cornwall's arguments that the lease expired upon the receiver's appointment because of a termination provision contained in the lease. Similarly unavailing is the argument that commencement of the bankruptcy case caused the lease to terminate. As Paragon has noted, the lease grants the lessor, not the lessee, the option of terminating the lease upon the occurrence of one of the specified events. Paragraph 16(a) of the Agreement of Lease provides as follows:

[I]f at any time during the term hereby demised there shall be filed by or against Tenant in any court pursuant to any statute either of the United States or any state, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee ... this lease, *at the option of the Landlord* may be cancelled or terminated ... (emphasis added).

11 U.S.C. § 365(d)(4). According to Bankruptcy Rule 9006, the 60 day time period begins to run the day after the bankruptcy petition is filed. Therefore, the 60 day time period began to run on June 16, 1992 and expired on August 14, 1992. Bankruptcy Rule 9006.

---

2. Cornwall asserts the administrative period terminated 8/14/92 while Paragon asserts the 60 days expired 8/15/92. ¶ 42.

§ 365(d)(4) provides as follows:
[I]f the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief ... then such lease is deemed rejected ...

*See* Schaevitz Cert. Exh. A.[3] There is no indication that Paragon invoked paragraph 16(a) after the commencement of the bankruptcy case. Therefore, Cornwall's argument is without basis.

Similarly, to the extent that Cornwall argues that the appointment of the receiver terminated the lease by operation of law, the Court finds the argument without merit. N.J.S.A. 14A:14–4(1) provides as follows:

> (1) Upon his appointment, the receiver shall become vested with the title to all the property of the corporation, of every nature, including its franchises.

N.J.S.A. 14A:14–4(1).

■ Nothing in the language of this provision supports the inference that the vesting of the debtor's leasehold interest in a receiver effects the termination of the lease obligations. Rather, the effect of the statute is that like a trustee in bankruptcy, a receiver steps into the shoes of the debtor. Under the Bankruptcy Code, a receiver is a custodian of the debtor's property and is required to "deliver to the trustee any property of the debtor held by or transferred to such custodian ..." 11 U.S.C. § 543(b); 11 U.S.C. § 101(11)(A). Thus, at the commencement of the Chapter 11 case, the receiver was obligated to restore to Cornwall, as a Debtor in possession, any property of the Debtor including its interest in the lease.

Next, Cornwall asserts that the lease terminated pre-petition because it vacated the Premises in·October of 1991, and Paragon accepted the "surrender" of the Premises by changing the locks to the Premises without notifying or providing the keys to Cornwall.

■ Surrender requires that the parties intend "to relinquish[ ] the relation of landlord and tenant," and that the parties commit an act independent of their express intent to demonstrate that the landlord and tenant relationship has concluded. *Duncan Dev. Co. v. Duncan Hardware*, 34 N.J.Super. 293, 299, 112 A.2d 274 (App.Div.1955), cert. denied 19 N.J. 328, 116 A.2d 829 (1955). Surrender " 'commonly occurs when the ten-

ant abandons possession during the term in such manner as to indicate his intent to terminate the lease; and the landlord takes possession, in such manner as to show that he intends to reassume control for his own benefit, and not for the benefit of the outgoing tenant.' " *Id.*, 34 N.J.Super. at 300, 112 A.2d 274 (quoting *Reeves on Real Property*, § 652, pp. 916–7). Cornwall has the burden of proving that the parties intended a surrender of the lease Premises and that they acted in accordance with that intent. Thus, the tenant must abandon, and the landlord must accept the tenant's abandonment. *Id.* at 300, 112 A.2d 274. If Cornwall is successful in proving a surrender, Cornwall will not be obligated to pay rent due after the surrender. *Id.* at 299–300, 112 A.2d 274.

■ Thus, the initial inquiry is whether Cornwall abandoned the Premises with the intent to terminate the lease. Cornwall claims that it ceased operating in July of 1991 and vacated the Premises in October of 1991 when Lehman was appointed as receiver. Cornwall asserts in its Memorandum that Lehman sent a notice to Cornwall's creditors regarding his appointment. Cornwall maintains that because of this notice, Paragon had notice that Cornwall ceased operating and was no longer occupying the Premises. However, Cornwall has not submitted any certification by an officer or employee of the Debtor to support this assertion nor has it provided the receiver's notice. Further, Cornwall has not demonstrated that the receiver did not use the Premises to conduct the business of the receivership.

Cornwall also asserts that although it left some equipment behind, this will not defeat an otherwise valid vacation of the Premises. *Liqui–Box Corp. v. Estate of Elkman*, 238 N.J.Super. 588, 598, 570 A.2d 472 (App.Div. 1990), cert. denied 122 N.J. 142, 584 A.2d 214 ("use of a building, formerly used for other purposes, to store a few articles cannot defeat a claim of vacancy ... nor can the mere presence of several minimal items left behind"). However, Cornwall did not remove the filing cabinets and office equipment until

---

**3.** More importantly, even if the Court shared Cornwall's interpretation of the lease provision, with respect to the effect of the bankruptcy filing,

11 U.S.C. § 365(e)(1) renders ipso facto clauses, such as the foregoing, ineffective.

September of 1992 and even then, it left behind a significant amount of furniture, office equipment and personal items which were not sold until November of 1993. A review of these facts do not unequivocally manifest that Cornwall intended to vacate the Premises in October of 1991. In light of the foregoing, the Court rejects Cornwall's assertion that there was a surrender. Instead, on the facts presently before it, the Court finds that at best, Cornwall vacated the Premises after the sale of the remaining furnishings and equipment was consummated on November 21st and November 26th of 1993.

■ Even if the Court assumes that Cornwall intended to surrender the Premises, it does not necessarily follow that Paragon accepted the surrender by changing the locks. First, the Court notes that Paragon permitted Cornwall to access the Premises and remove its property. Second, Paragon provided Cornwall's agents with the new keys which Cornwall never returned. Finally, since the beginning of this Chapter 11 case, Paragon has persistently requested Cornwall's attorneys to address Cornwall's use and occupation of the Premises. *See* Zucker Cert. at ¶ 2. Such conduct is hardly consistent with acceptance of a surrender of the Premises.

Cornwall argues alternatively that it was constructively evicted when Paragon changed the locks. Eviction is an act committed by the landlord in order to permanently deprive "the tenant of the beneficial enjoyment of the demised premises[.]" *Duncan*, 34 N.J.Super. at 297, 112 A.2d 274. The landlord must clearly indicate an intention "that the tenant shall no longer continue to hold the premises." *Schnitzer v. Lanzara*, 115 N.J.L. 332, 337, 180 A. 234 (1935). If the landlord's actions constitute eviction, the tenant is justified in abandoning or vacating the premises and is relieved from performing the terms of the lease so long as the tenant actually "abandons or vacates the premises as a result of a wrongful act of the landlord." *Duncan*, 34 N.J.Super. at 297, 112 A.2d 274. Generally, "a tenant's right to claim a constructive eviction will be lost if he does not vacate the premises within a reasonable time after the right comes into existence." *Reste Realty Corp. v. Cooper*, 53 N.J. 444, 461, 251 A.2d 268 (1969). "[T]emporary obstruction of a passageway or the mere abridgement or interference by the landlord with the enjoyment of the premises would not necessarily constitute a constructive eviction." *Duncan*, 34 N.J.Super. at 298, 112 A.2d 274.

■ Cornwall has not satisfied the Court that the re-keying of the Premises constitutes a constructive eviction. *Alexandria Realty Co. v. Whitman*, 8 N.J.Misc. 21, 148 A. 12 (Sup.Ct.1929) (tenant bears the burden of proving constructive eviction). First, Cornwall must establish that it vacated or abandoned the premises "*as a result of a wrongful act of the landlord.*" *Duncan*, 34 N.J.Super. at 297, 112 A.2d 274. (emphasis added). However, the facts reveal that Cornwall continued to use the Premises for storage in the same manner as it did prior to the change of the locks. Moreover, because Cornwall did not vacate within a reasonable time from when the locks were changed, it lost whatever right it may have had to argue that it was constructively evicted. Additionally, Cornwall must show that Paragon intended to permanently deprive it and did deprive it "of the beneficial enjoyment of the demised premises[.]" *Id.* Once again, the facts are that Cornwall was not permanently deprived of the Premises because it was permitted to enter the Premises and was given a set of the new keys. As a result, Cornwall's argument of constructive eviction also fails.

As a consequence of the foregoing analysis, it is apparent that none of the Debtor's asserted grounds for pre-petition lease termination have any factual or legal basis. Accordingly, it appears that Cornwall is liable for rent accrued after the commencement of the bankruptcy case. However, the amount of rent that Paragon is entitled to receive as an administrative priority under section 503 of the bankruptcy code, remains to be determined.

There are two divergent approaches to determine the "reasonable value of use and occupancy," the objective approach and the subjective approach. The objective approach outlined by the Court in *Kneeland v. American Loan and Trust Co.*, 136 U.S. 89, 10

S.Ct. 950, 34 L.Ed. 379 (1890), "measures the landlord's claim by the reasonable value of the leased property without regard to the actual use by the debtor." *In re Mohawk Industries, Inc.*, 54 B.R. 409, 412 (Bankr. D.Mass.1985). The subjective approach, on the other hand, limits the landlord's recovery to the value of the debtor's actual use of the property. *Id.*

In general, a debtor's post-petition rental expense will constitute actual and reasonable expenses of the estate as required by section 503(b)(1)(A) so as to be accorded administrative expense priority pursuant to section 507(a)(1). As explained by the Third Circuit in *Zagata Fabricators v. Superior Air Prod.*, 893 F.2d 624, 627 (3d Cir.1990):

> There is no question, of course that the payment of rent for the use and occupancy of real estate ordinarily counts as an "actual, necessary" cost to which a landlord, as a creditor, is entitled. (citations omitted). In order to survive, a financial entity almost always needs a physical space to occupy. When a debtor owns no suitable real estate of its own, its only choice is to become a tenant, and to assume the obligations of paying periodic rent to a landlord. In such circumstances, therefore, rent is clearly an "actual, necessary" cost of preserving the estate, since the debtor's survival depends on its ability to pay the landlord for the right to possess the space necessary to conduct its business. Because bankruptcy proceedings are considered to be equitable, however, the landlord's right to collect monetary relief is somewhat curtailed; a debtor is generally required to pay only a reasonable value for the use and occupancy of the landlord's property, which may or may not equal the amount agreed upon in the terms of the lease. *See In re Mohawk Indus. Inc.*, 54 B.R. 409 (Bankr.D.Mass.1985).

*Zagata*, 893 F.2d at 627.

Utilizing the guidance provided by the court's observations in *Zagata*, this Court finds that the objective approach to determine a debtor's reasonable use and occupancy of a landlord's premises is consistent with the express language of Code sections 503 and 507, and properly balances the interests of the debtor's estate and those of the landlord.

Under the objective approach, "the lessor is entitled to collect the fair rental value of the leased premises so long as the debtor is occupying the leased property and using it to help preserve the estate" regardless of whether the property is being put to the same use as it was pre-petition. *In re F.A. Potts & Co., Inc.*, 137 B.R. 13, 17 (E.D.Pa. 1992). "[T]he court 'should not consider that the [debtor] has used only for storage purposes property that had been occupied by a going business.'" *Id.* (quoting *Diversified Services, Inc. v. Harralson*, 369 F.2d 93, 95 (5th Cir.1966)). Similarly, the court in *Mohawk* stated that "where the debtor continues to possess the premises, its liability for the lease payment rate is not affected by its purported use of the property for storage." *Mohawk*, 54 B.R. at 412; *In re Grimm & Rothwell, Inc.*, 108 B.R. 186, 190 (Bankr. S.D.Ohio 1989) (it is inconsequential to the determination of the rental value that property previously used for business was used for storage).

Further, as the court in *Potts* held, "the rental value fixed in the lease will control, unless there is convincing evidence that such rental rate is unreasonable." *Potts*, 137 B.R. at 18 (citing *Mohawk*, 54 B.R. at 412). Similarly, the court in *Mohawk* asserted that "in the absence of any convincing evidence to the contrary, [the court] will presume that the rental payment fixed in the lease is reasonable." *Mohawk*, 54 B.R. at 412; *In re Energy Resources Co., Inc.*, 47 B.R. 337, 339 (Bankr.D.Mass.1985) ("rent under the lease is the appropriate use and occupancy rate unless the debtor produces evidence that it is unreasonable."); *In re Thompson*, 788 F.2d 560, 563 (9th Cir.1986) ("fair and reasonable value of the lease upon the open market" controls the determination of reasonable value not the "actual value or benefit conferred on the debtor").

In *Mohawk*, the parties attempted to distinguish the fair rental value for the time when the property was used for manufacturing and when it was used for storage. *Mohawk*, 54 B.R. at 412. The court found that the use of the property for storage directly benefited the debtor. *Id.* at 413. Thus, the court refused to differentiate between the manufacturing and storage periods and held that absent convincing evidence that the rent reserved in the lease was unreasonable, the lease terms controlled for both periods. *Id.* The court then calculated the fair rental value by multiplying the amount of rent reserved in the lease by the amount of square feet occupied by the debtor, not the amount of space actually leased by the debtor. *Id.; Grimm*, 108 B.R. at 190 (the court made an allowance for administrative rent only for the actual amount of space used).

On the record presently before the Court, it appears that estate property remained in the Premises and the value was preserved at least until the second private sale in November of 1993. The Debtor's suggestion that the property was inconsequential is belied by the description in the Notices of Sale and the fact that the Debtor chose to sell rather than abandon the property. That the Debtor was not able to realize significant funds for the property reflects the unfortunate bankruptcy reality that such sales frequently do not realize more than a fraction of the value of the property. It also suggests that perhaps the Debtor should have moved with greater alacrity to dispose of the property so as to maximize the amount realized from the sale and to minimize the associated expenses. However, the fact that the estate assets were preserved while stored on the Premises is unaltered.

Because administrative expenses can only be allowed for actual and necessary costs of preserving the estate, it is not clear whether Paragon is entitled to receive administrative priority for rents accruing after the second private sale. *Zagata*, 893 F.2d at 627; 11

U.S.C. § 503(b). Further proofs may show that the items left behind after the second sale were truly inconsequential and that the estate was not benefited by their storage. Paragon is, however, potentially entitled to administrative priority for the reasonable value of rents from June 15, 1992, the commencement of the bankruptcy case to November 26, 1993, the final sale date.

Paragon has argued that it is entitled to the rent reserved in the lease as an administrative expense for the entire post-petition period. Indeed, there is no evidence in the record to indicate that the rent reserved in the lease is unreasonable. However, Cornwall's liability for administration rent for the entire post-petition period may be subject to reduction by reason of Paragon's failure to mitigate its damages. *In re Sporting Way, Inc.*, 126 B.R. 110, 113 (Bankr. M.D.Fla.1991) (claim for administrative priority for rent will be reduced if there is no evidence that the lessor attempted to mitigate damages).

There is no question that in New Jersey commercial lessors are obligated to mitigate their damages in the same way as residential lessors. *McGuire v. City of Jersey City*, 125 N.J. 310, 320, 593 A.2d 309 (1991). The imposition of the obligation to mitigate damages is consonant with public policies of "denying the injured party the opportunity to sit idly by and exacerbate damages; discouraging economic and physical waste" and encouraging the use of vacant property. *Fanarjian v. Moskowitz*, 237 N.J.Super. 395, 404, 568 A.2d 94 (App.Div. 1989).

Paragon, as the lessor, has the burden of proving that "actions [were] taken to mitigate damages." *McGuire*, 125 N.J. at 323, 593 A.2d 309. If this showing is not made, the lessor's recovery for unpaid rent will be reduced by the sum which the lessor would have received had damages been mitigated. *Carisi v. Wax*, 192 N.J.Super. 536, 542, 471 A.2d 439 (Bergen County Ct.1983).

In *Carisi,* the court posited that commercial lessors have a duty to mitigate, absent a contractual provision releasing the landlord of such duty. *Id.* The court in *Carisi,* held that the following lease provision did not obviate the lessor's duty to mitigate:

"if the premises become vacant, the landlord shall have the right to enter the premises as the agent of the tenant, without being liable for prosecution or damages, and it authorizes the landlord to 'relet the premises as the agent of the tenant and receive the rent therefrom upon such terms as may be satisfactory to the landlord....' It also provides that 'Such reentry by the landlord shall not operate to release the tenant from any rent to be paid.... hereunder during the full term of this lease.'"

*Carisi,* 192 N.J.Super. at 540–41, 471 A.2d 439.

 In the instant case, the Paragraph 18 of the Agreement of Lease entitled Remedies of the Landlord provides in pertinent part as follows:

In case of any such default, re-entry ... (a) the rent shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration, together with such expenses as Landlord may incur for legal expenses, attorneys' fees ... The failure of Landlord to re-let the premises or any part or parts thereof shall not release or affect Tenant's liability for damages.

*See* Paragon's Memo., Exh. A. ¶ 18. As in *Carisi,* the provision in the lease before the Court in this case does not release Paragon from its obligation to take actions to mitigate damages.

As the case of *Fanarjian v. Moskowitz* makes clear, the lessor must make a sufficient effort in order to satisfy the duty to mitigate damages. *Fanarjian,* 237 N.J.Super. at 397, 568 A.2d 94. In *Fanarjian,* a commercial tenant vacated the premises and stopped paying rent in breach of the lease. Despite testimony that the lessor "placed some weekly and biweekly newspaper advertisements, as well as having forwarded advertisements to some professional journals[,]" the court denied the lessor the recovery of unpaid rents because the lessor "was not certain whether the advertisements had run in any of those journals." *Id.* at 398–99, 568 A.2d 94. The court found that these efforts were minimal and did not satisfy the lessor's obligation to mitigate damages. *Id.*

In the instant case, it is unquestionable that Paragon had a duty to mitigate damages. However, because the current record is not sufficiently developed, the Court cannot discern what efforts, if any, were taken by Paragon and when Paragon's duty to mitigate damages commenced. For example, in the post-petition period a greater factual record might show that the duty to mitigate arose after the lease was automatically rejected pursuant to Code section 365, or perhaps after the sales were accomplished in November of 1993. Perhaps on a more developed evidentiary record the Debtor can demonstrate that the landlord's duty to mitigate arose pre-petition upon cessation of the debtor's operations or appointment of the receiver. The foregoing examples are not intended to limit either Cornwall or Paragon in a further presentation to the Court. Rather, the examples are intended to illustrate the need for a greater record.

The parties are instructed to confer on whether to present the balance of the evidence by documentary evidence or testimony and report to the Court within two weeks of the date of this opinion. A status conference will be scheduled thereafter.